UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-07-54-B-W |
| | ) | |
| KURT CARTER | ) | |

**SENTENCING ORDER**

The Court rejects the Defendant's arguments that his involvement in a conspiracy to export eighteen handguns to Canada did not implicate the security or foreign policy interests of the United States under U.S.S.G. § 2M5.2.

## I.  STATEMENT OF FACTS

On September 24, 2007, Kurt Carter pleaded guilty to engaging in a conspiracy to export firearms without a license, a violation of 18 U.S.C. § 371 and 22 U.S.C. § 2278.  During Mr. Carter's Rule 11 hearing, he admitted to the facts in the Prosecution Version, which stated that on eight specific occasions in 2005 and 2006, he purchased a total of eighteen firearms for Andrew Porter, a Canadian citizen.  The Prosecution Version further revealed that Mr. Carter knew that Mr. Porter was bringing the firearms across the United States border into Canada.  He now comes for sentencing.  Under U.S.S.G. § 2M5.2, the applicable guideline provision, the base offense level is 14 unless the offense involved only non-fully automatic small arms (rifles, handguns, or shotguns), and "the number of weapons did not exceed ten."  U.S.S.G. § 2M5.2(a)(2).  If the number of non-fully automatic small arms,exceeded ten, however, the base offense level jumps to 26.  *Id.* § 2M5.2(a)(1).  Mr. Carter's admitted conduct falls within the higher base offense level, because the number of firearms involved in the conspiracy exceeded ten.

### A.    Mr. Carter's Contentions

Pointing, however, to the Commentary to § 2M5.2, Mr. Carter notes that the base offense level "assumes that the offense conduct was harmful or had the potential to be harmful to the security or foreign policy interest of the United States." *Id.* § 2M5.2 cmt. n.1. The Commentary goes on the say that "[i]n the unusual case where the offense conduct posed no such risk, a downward departure may be warranted." *Id.* Mr. Carter argues that this case is such an unusual case and that the base offense level for his criminal conduct should be 14, not 26. *Def.'s Mem. in Aid of Sentencing* (Docket # 24) (*Def.'s Mem.*). Observing that there are only a few reported cases involving § 2M5.2, Mr. Carter argues that the facts in those cases differ markedly from the facts in his case. He states that only one court seems to "have addressed the specific departure provision contained in § 2M5.2 . . . the Second Circuit in *United States v. Hendron* . . . ." *Def.'s Mem.* at 5 (citing 43 F.3d 24 (2d Cir. 1994)). In *Hendron*, the defendant was involved in selling 110 AK-47s to Iraq and concluded that the proper test to determine whether to downward depart is "the normal potential of the offense conduct as perceived by that defendant." *Hendron*, 43 F.3d at 26. Also, Mr. Carter says that there are notable differences between his case and *Hendron*, including the number of firearms. *Def.'s Mem.* at 7, *see United States v. Pedrioli*, 978 F.2d 457, 460 (9th Cir. 1992) (addressing the sale of 800 handguns to the Philippines under the 1987 version of the Guidelines).

Mr. Carter contends that about half of the eighteen handguns involved in the offense have been recovered. *Def.'s Mem.* at 2. He has information about three of the firearms. One, a .22 caliber derringer, was recovered from a man stopped by Canadian police while just walking down the road; there is no evidence, he contends, that the firearm was involved in any criminal activity. *Id.* at 3. A second firearm was recovered from a person who had used the gun to

threaten a nightclub employee. *Id.* A third firearm was found in the possession of a person arrested on December 12, 2006, in Canada with a pound of cocaine, a significant amount of domestic marijuana, in excess of $120,000 cash, several rifles, and two handguns, one of which was traced to Mr. Carter. *Id.* at 3-4. With only two links to criminal conduct, Mr. Carter urges the case should fall within the less serious category of conduct, meriting a base offense level of 14, rather than the more serious level, deserving a base offense level of 26.

  **B.**  **The Government's Responses**

  The Government provides further context to the three instances where handguns purchased by Mr. Carter have been recovered. *Government's Mem. in Aid of Sentencing* (Docket # 29) (*Gov't's Mem.*). The first incident, the most benign of the three, involved a police stop of two nineteen year old males who had been drinking and were walking on the side of a road in Saint John, New Brunswick. One of the men had a .22 derringer in his jacket pocket. *Id.* Ex. 4. The second incident took place in Toronto, Canada. The individual who brandished the firearm during the nightclub altercation was reputedly a member of a gang and is a person of interest in a homicide investigation. *Id.* Ex. 3. The third incident occurred in Fredericton, New Brunswick, and involved a person the police considered to be a known cocaine trafficker. *Id.* Ex. 3. The Government implies that the cumulative impact of these three incidents is not benign.

  The Government next argues that the Commentary to § 2M5.2 asks whether the defendant's conduct is either actually harmful to the security or foreign policy interests of the United States or has the potential to be harmful to those interests. *Id.* at 4. It points to evidence that illegal trafficking in firearms is a major irritant in the relationship between the United States and Canada. *Id.* at 8-10. Canada's firearms laws are much stricter than the laws in the United States and this Country has been the source of a black market in illegal firearms that remains a

major law enforcement concern in Canada. *Id.* Ex. 1; *Government's Supplemental Mem. in Aid of Sentencing* (Docket # 30) (*Supplemental Mem.*). The two countries have entered into agreements to assist each other to investigate illegal firearms. *Gov't's Mem.* Ex. 5. The United States Department of State has provided an affidavit that confirms "arms trafficking from the United States to Canada is a significant law enforcement and foreign policy issue between our two countries." *Supplemental Mem.* Ex. 1 ¶ 5.

Finally, the Government disputes both the applicability and the logic of *Hendron*, the Second Circuit case relied upon by Mr. Carter.[1] The Government says that *Hendron* involved only an attempt to export arms, not a conspiracy that had been successful in exporting firearms, and the defendant in *Hendron* was in fact dealing with an undercover police officer, so that, unlike Mr. Carter's case, there was no actual danger that the arms would have been exported. In any event, citing a recent Second Circuit case, *United States v. Sero*, 520 F.3d 187 (2d Cir. 2008), the Government asserts that *Hendron* is flawed and that the Court should not adopt its doubtful logic.

## II.    DISCUSSION

### A.    The Base Offense Level

The Court cannot accept Mr. Carter's argument that the base offense level should begin at 14. First, to do so would contravene the plain language of the guideline, which provides that the base offense level of 14 is applicable only "if the offense involved only non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed ten." U.S.S.G. § 2M5.2(a)(2). Here, the firearms were non-fully automatic handguns, but the number did exceed ten. The base offense level of 26 applies.

---

[1] The Government cites the title of the case as *Gendron*, not *Hendron*, but it otherwise appears that the parties are discussing the same case.

### B.  Downward Departure

The Court also rejects Mr. Carter's argument that he is entitled to a downward departure because the sale of eighteen non-fully automatic handguns does not implicate the "security and foreign policy interest of the United States." *Id.* § 2M5.2 cmt. n.1. As the downward departure would benefit him, Mr. Carter bears the burden of demonstrating that the security and foreign policy interests of the United States are not involved. *United States v. Sachdev*, 279 F.3d 25, 28 (1st Cir. 2002) (stating that a defendant "bears the burden of proof by the preponderance of the evidence of showing eligibility for a Guidelines departure.").

The evidence in this case amply supports the conclusion that in engaging in a conspiracy to export eighteen handguns to Canada, Mr. Carter's crime implicated the security and foreign policy interests of the United States. The Government's exhibits establish that law enforcement on both sides of the border between the United States and Canada are cooperating to restrict the flow of illegal firearms from this Country to the black market in Canada. Further, because Canada's firearms laws are much more restrictive than this Country's, there is a greater likelihood that exported handguns will end up in the hands of criminal elements in Canada.

This is precisely what has happened here. The Court is also unconvinced that the circumstances under which three of the illegally exported handguns were recovered were benign. The evidence establishing that three of the eighteen handguns have ended up in the possession by an intoxicated teenager in Saint John, by a known gang member suspected of violent crime in Toronto, and by a significant cocaine dealer in Fredericton. This evidence strongly supports, rather than undercuts, the seriousness of Mr. Carter's conduct.

The Court accepts Mr. Carter's contention that the circumstances of this crime are hardly indicative of a major international gun running operation. Here, the number of firearms, the

5

Defendant's sophistication, and the degree of the national interest pale when compared with some other cases. *See United States v. Nissen*, 928 F.2d 690, 691 (5th Cir. 1991) (stating that the defendant was interested in procuring C-130 aircraft, military aircraft parts, Stinger missiles, and rifles). However, the application note suggests that "[i]n determining the sentence within the applicable guideline range," the court "may consider the degree to which the violation threatened a security or foreign policy interest of the United States, the volume of the commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences." U.S.S.G. § 2M5.2, cmt. n.2. The Court will take these and other factors into account at the sentencing hearing.

To the extent *Hendron* instructs that the proper application of § 2M5.2 requires the trial court to assess "the normal potential of the offense conduct as perceived by that defendant," the Court declines to follow the Second Circuit. *Hendron*, 43 F.3d at 26. Congress criminalized the willful violation of this Country's controls on the export and import of defense articles and services. 22 U.S.C. § 2778. It did so because the export of such articles could have adverse consequences to "world peace and the security and foreign policy of the United States . . . ." *Id.* § 2778(a)(1). To prove a violation under § 2778, the Government must demonstrate "that the defendant voluntarily and intentionally violated a known legal duty not to export the proscribed articles." *United States v. Murphy*, 852 F.2d 1, 7 (1st Cir. 1988) (citation omitted). The Government is not required to prove that the defendant had specific knowledge of the licensing requirements and the Munitions List under the Arms Export Control Act. *Id.* at 6.

*Hendron* seems to require the difficult application of a mixed subjective/objective process whereby the trial court must glean (1) what the defendant perceived (2) the normative potential of his offense conduct. From this Court's perspective, however, contrary to *Hendron*,

the same principles that apply to a violation of the law should apply to its punishment.  Specific intent to affect world peace and the security and foreign policy of the United States is not the proper inquiry at sentencing, since the illegal exportation of arms could well have consequences far beyond what the defendant contemplated or understood.   At sentencing, the Court is chary about attempting to delve into the defendant's mind, extract what he thought would happen, evaluate the normative potential of his actions, and then sentence him on his perceptions of those normative consequences.

Further, it is questionable whether the *Hendron* test remains the law in the Second Circuit.  Just recently, the Second Circuit rejected an argument that § 2M5.2 requires specific intent.  *United States v. Sero*, 520 F.3d 187 (2d Cir. 2008).  *Sero* stated that "although specific intent is an element of the crime to which Sero pled guilty, it is not a factor considered in § 2M5.2(a).  Whether Sero intended the parts to be used in fully automatic . . . weapons is, therefore, irrelevant." *Id.* at 191.

Finally, even under *Hendron*, the Court concludes that Mr. Carter's base offense level should be 26.  The Court considers the predicate for the crime – namely, that a Canadian citizen came to the United States to obtain weapons to take back to Canada.  This fact alone should have alerted the Defendant that assisting the export of small arms into Canada would run counter to Canadian law and would pose a potential problem in the relationship between Canada and the United States. The Court considers several other factors:  (1) the number of firearms – eighteen; (2) the nature of the firearms – inexpensive, easily concealable handguns; (3) the conspiracy involved multiple purchases in the years 2005 and 2006; and, (4) the well-known fact that Canada has stricter gun control laws than the United States.   When combined, the Court concludes that Mr. Carter likely perceived that his participation in the conspiracy to export

multiple handguns to Canada implicated the security and foreign policy concerns of the United States.

## III.     CONCLUSION

The Court rejects the Defendant's contentions. It concludes that Mr. Carter's base offense level is 26, and that he is not entitled to a downward departure because his conduct implicated "security and foreign policy interest of the United States."

SO ORDERED.

                                               /s/ John A. Woodcock, Jr.
                                               JOHN A. WOODCOCK, JR.
                                               UNITED STATES DISTRICT JUDGE

Dated this 6th day of May, 2008